TRIREME Energy Good morning and may it please the Court, Amy Saharia of Williams & Connolly for the TRIREME Appellants. The Court should vacate and remand for two reasons. First, as to the Race to Dakota defense, the District Court applied a searching and exhaustive diligence standard that has no basis of precedent, and even if that standard were correct, the handful of unclear documents the Court relied on do not contradict Iris' own assertions that it would continue to own the development companies. Second, on the merits, the contract unambiguously prohibited Iris from assigning or transferring the development companies without consent or payment. The District Court erred in rewriting that unambiguous language to conform to the Court's own and incorrect view of what was reasonable. I'll start with Race to Dakota unless the Court wishes to start elsewhere. We agree the relevant question before the Court is whether TRIREME could have been I think you have a very strong argument with respect to the second point. So I think you have to be very convincing as to the Race to Dakota point, at least as far as I'm concerned, the District Court just imported its own notions into the contract that had clear language to the contrary, but what about the Race to Dakota? Because you have to succeed on both. Understood, Your Honor, and, of course, we agree with Your Honor on the second point. So let me tackle Race to Dakota. The Court applied at SPA 101 and 103 a due diligence standard that the Court characterized as requiring a searching inquiry and an exhaustive inquiry. But the standard is simply due diligence, which means diligence that is reasonable under the circumstances. Importantly, RWE bears the burden to prove its Race to Dakota defense. Here, the relevant facts include IRIS's own conduct and its own representations to TRIREME, including when we asked IRIS for a structure chart showing what the structure would be after the transaction, and we show that chart that gave us at page 14 of our brief. They provided a chart that showed that IRIS would continue to own the development companies. The subsidiaries still showed underneath IRIS. And this was given to you in response to a request for that information? Exactly. We expressly asked for that information. We made that request, by the way, after the documents the District Court relied on in the FERC database and in the Public Service Commission database that show unclearly, they don't even show that these subsidiaries were going to move to a different part of RWE. But even assuming those unclear documents should have prompted us to make an inquiry if we had known to go look for them, we did conduct an inquiry. We asked IRIS for this information, and they provided an incorrect representation. But in the first litigation, I mean, you sought to amend the complaint to make this very claim, right? Yes, Your Honor. And then you didn't appeal it. You didn't appeal the denial of the motion to amend. Why isn't that the end of the story? I mean, that's the way this is supposed to go. You make a motion to amend. If it's denied, you then get to appeal that with the first judgment. This Court has rejected that proposition. It has. Yes. I would point the Court not only to Curtis, but also to the case law cited in Curtis, importantly, the Northern Assurance. But Curtis is talking about situations where the denial was for a non-due diligence or lack of due diligence basis, right? If it's for the convenience of the Court, then okay. Then the fact that you brought a new case rather than appeal it with the first judgment is excused. But that's not what happened here. Here, this is a situation where the denial of the motion to amend was because you slept on it by not exercising due diligence. Maybe that's right. Maybe that's wrong. But that's when you get to appeal it with the first judgment. Respectfully, we disagree. I think that particular issue might be relevant to issue preclusion, an argument that in this case we were barred from re-litigating the issue of due diligence. The district court in this case in Trireme II rejected that argument at the motion to dismiss stage. And RWE has not re-asserted an issue preclusion defense. I think your position was that the denial was not on the merits. Exactly, Your Honor. And therefore, under our case law, you didn't have to appeal it. Correct. And that is what Curtis holds. That is what Northern Assurance holds, which is cited in Curtis. And importantly, in Northern Assurance, this Court expressly discussed the EPCO case that RWE hangs its hat on and says that EPCO does not stand for the proposition that a failure to appeal a denial of leave to amend gives rise to res judicata. In fact, the Court in Northern Assurance, and then again in Curtis, says denial of leave to amend is simply irrelevant to res judicata unless it is on the merits. This denial was not on the merits. To the contrary, the original district judge that denied leave to amend acknowledged that the claim had merit on the merits of the contract claim. Now, the district court cited no case that requires this kind of exhaustive inquiry that would require looking in databases to hunt down documents that contradict assertions from your own counterparty. And I would note in particular that in Trirene 1, Iris was our counterparty in litigation. They were a party to that case. And even after Iris emerged out of existence in December of 2020, they never disclosed to the district court or to us that they were no longer in existence. To the contrary, they made representations in pleadings in that case that they continued to exist, we pointed to that answer. And that are reflected on these, on the charts, on the organization charts. I'm sorry, Your Honor? And that are reflected on the, that point is reflected on the organization charts. Yes, exactly, Your Honor. The organization chart that they gave to us in April of 2020, just two months before the asset swap, showed, number one, that Iris would continue to exist, and number two, that it would continue to own its subsidiaries. Now, on the merits, the district court made three fundamental errors. Number one. I mean, didn't Iris continue to exist in the sense that when two companies merge, regardless of what name is applied to the company that survives, the company that was merged with it continues to exist, and the merged company retains all the obligations that the merged out of existence company had. That may be correct, Your Honor, but in this case, the surviving company was not Iris. It was an RWE subsidiary, and so Iris could not have represented in litigation that Iris continued to exist, because as a legal matter, Iris no longer existed. As a matter of law, doesn't the company continue to exist in the sense that all of its obligations continue to be, both its obligations and its entitlements, continue in the surviving company, and regardless of what name the surviving company is given, and regardless of the appearance, the legal obligations and the legal entitlements all continue to exist? The rights and obligation exist, but the company itself does not. When two companies merge, only one survives, and in this case, Iris was the company that was merged out of existence, but. Is it also a fact that the assets in question ceased to belong to that company and were transferred to elsewhere? Yes. On July 1st of 2020, Iris then was still in existence. It had not been merged out of existence. It assigned and transferred the relevant assets, meaning the development companies, to an entirely different subsidiary of RWE. So in other words, the debate that we were having about whether the company that's merged continues to exist or not, that becomes irrelevant, because the assets were, in any event, transferred elsewhere. It's not relevant to the contract claim, but Iris has pointed to the merger certificate filed in December 2020 showing that Iris merged out of existence as somehow should have put us on notice of the transfer. But that transfer had occurred at a time when Iris was still in existence, and nothing about the fact that Iris merged into another company should have put us on notice that Iris had transferred its subsidiaries even before that point in time. Does the record reflect, correct me if I'm wrong, that Iris had assured your client that immunology subsidiaries would remain wholly owned by Iris? Yes. That chart that's at page 14 of our brief shows 100% that it would continue to own those subsidiaries 100% wholly owned. The arrows point down on that chart showing the flow of ownership down all the way to those subsidiaries. I see I'm out of time, Your Honor, unless there are further questions. I'll reserve. All right. Thank you. You have two minutes for rebuttal. We'll hear now from Ms. Leder. Good morning, Your Honors. Susan Leder, law firm Paul Hastings, on behalf of the RWE appellees. This case is truly TriReam's second bite at the same apple. Only, I think, five months ago, we were here in front of this court with respect to TriReam One. And that was a litigation about TriReam's claimed entitlement to a $70 million milestone payment with respect to the Casadena Wind Project. Now in TriReam Two, TriReam argues that it's entitled, again, not just to that $70 million milestone payment, but another $40 million in honored milestone payments by virtue of the fact that the assets were moved from one RWE entity to another as part of an internal restructuring, which had no impact on TriReam whatsoever. Now TriReam failed to raise this theory. They had a breach of contract claim in TriReam One, but they failed to raise this theory in TriReam One. And when they did finally try to raise it, which is two years or so in the litigation, and after the close of discovery, the district court denied TriReam's motion for leave to amend, and TriReam did not appeal that denial. In this case, the district court recognized that TriReam's failure to appeal that denial for leave to amend in TriReam One means that it's barred for bringing its claim here and raised judicata. And the court can affirm the decision on that ground alone, but the district court also correctly held, made the factual finding that raised judicata also barred the claim here because it could have been brought earlier if TriReam had exercised due diligence. And in the end of the whole point of raised judicata is to not try things twice. So, I mean, that is the whole reason why we set it up that way. So, anyway, but you're principally arguing raised judicata right now, right? And I'll also address the merits because we believe the district court correctly found that the contract was ambiguous and that RWE did not breach that provision purely by doing an internal reallocation of the energy, restructuring of its subsidiaries. But I'll start with raised judicata. And I just want to note that it is TriReam's burden. The default is these were claims, and here just a new breach of contract theory, being brought under the same contract, and that's the merger agreement. And so TriReam bears the burden of demonstrating that an exception to raised judicata applies. And what they argued was essentially that they couldn't have discovered this new theory of relief with due diligence. And the Court made a number of factual findings that that was an error. And I want to start with our numerous documents. I asked you to produce during discovery documents concerning the acquisition of IRIS by RWE. Do you recall that? I'm sorry, Your Honor, TriReam 1? Yes. There was voluminous discovery in TriReam 1. Of course there were. This is a complicated case, so I'm not asking you about the volume. I'm asking you about the specific one I'm interested in. I'm not certain. I don't believe that was an issue in TriReam 1, which was simply focused on the case. All right. So let me move on then. During discovery in TriReam 1, they asked you to produce documents concerning the acquisition of IRIS by RWE. You objected to that request on the grounds that it sought, quote, highly confidential and sensitive documents that have little to no bearing on the claims at issue in the case. And then you circle around, and then your theory becomes that information concerning this merger could have been accessed by, through a number of publicly available documents. So explain to me how you can take those two positions. Well, certainly, Your Honor. I should start with the fact that there was discovery produced in TriReam 1 back in November of 2020, which demonstrated that the assets were no longer under IRIS. And this is referenced by the Court Special Appendix 89. It has the underlying tax equity financing agreement. So the objection that Your Honor noted, and again, there were a number of requests, but there were documents produced in response to that request. Those documents certainly ought to have put TriReam on notice all the way back in November of 2020, because the tax equity financing agreement that I'm referencing showed IRIS crossed out as being the indirect owner of the subject-related asset. But Your Honor, I knew full well what its obligations were under the contract. We can get to the ambiguity argument if you want to, but my reading of that provision was that it was pollutant. So my question for you is, wasn't your client under an obligation to simply tell these people, well, we have affected this merger that is at least referenced, if not, let's pass the point of whether — I won't press the point about whether it was forbidden, but didn't you have an obligation to tell them that you were affecting this transaction? Isn't that just basic business honesty? So a couple of points, Your Honor. We did make it very clear that there was going to be a change in control of the parent. The fact — the ultimate ownership of IRIS and the fact that a transfer of that ownership from Biden GSE to the RWE entity was contemplated, I believe, even back before the merger agreement. It might have been executed, but before it was consummated — And there was extensive back and forth on that possibility, which is reflected, for example, in all of the draft contract provisions. But once you did it, you didn't — in the lead-up to doing it, you didn't tell them. Are you referring to the change in control, Your Honor? Because the change in control was something that was publicly — it was all over the press. It was something that was discussed at length with Trireme. And frankly, the organizational chart that Trireme references, the four-box organizational chart that they claim was misleading in nature, was actually presented to Trireme in connection with a large volume of other information. But it was a request about what does this change in ownership mean for Trireme? And the only right that Trireme had in connection with the change in ownership was with respect to the parent company guarantee. Because IRIS did not have enough assets at the time the merger agreement happened, the parties negotiated, and IRIS gave a parent company guarantee through its parent company. That guarantee — Well, that's a pretty important right, isn't it? I'm sorry? That's a pretty important right, isn't it? Agreed, Your Honor. But the parent company guarantee was agreed to, and it was and continues to be held by Energy SE. That was IRIS's parent. They didn't have — The only right that Trireme had under the agreement, and this is not in dispute, is to whether or not that parent company guarantee could be transferred to RWE. So Trireme asked a number of questions to — you know, about RWE, the new owner, in connection with whether or not upstream they should agree to have that parent company guarantee moved from Energy SE to RWE. And so the four-box organizational chart that was provided, along with other information, was all focused upstream and in connection with the request as to whether or not this parent company guarantee should be transferred. But I think Judge Parker was asking you about disclosure of the transfer of the assets that were not permitted to be transferred, and you changed the subject and talked about the change of control and the guarantee. What about the disclosure of the transfer of the assets, which ostensibly on the face of paragraph 7.6 is not — 7.6c is not permitted? Trireme didn't have any rights in the agreement to who owned IRIS, and certainly did not have any rights in terms of an internal restructuring. But the clause that we've been going back and forth with spoke specifically to that transfer. Well, respectfully, Your Honor, that clause, 7.6c, which talks about the right to sell, assign, transfer, or otherwise dispose of assets, was looking at the sale of a project. So it would be outside of the control of that company. And that was in connection with — Say that. Where do you find that in Section 7.6? Going outside the company. Well, where is that? Well, in connection — IRIS purchasers shall not sell, assign, transfer, or otherwise dispose of any of the assets, rights, or other properties of a target project or of the equity interests of a development company prior to December 31 without the express consent. Because if you look at IRIS's rights — I'm sorry, if you look at Trireme's rights under that agreement, the words otherwise dispose of is really focused on a disposal of those assets outside of that business such that Trireme would not have the ability to get its milestone payment. A literal reading of this actually would not serve Trireme's interest either because what the contract prohibits is for IRIS to sell, assign, transfer, or otherwise dispose. It actually does not mention any of IRIS's subsidiaries. And the only assignment that took place here was done by IRIS Windholdings, which is not defined in the agreement to be the purchaser. It's only limited to IRIS. But the parties understood — The problem I have is that's your spin on the text of 7.6. That's not what it says. But I think, Your Honor, there's precedent in this circuit. And I would refer to the court to Brass in other cases where if you look at the contract where there's a material omission, and here we believe there is such an omission. I mean, if you look at the Brass case, which deals with common stock, if you just enforced that term without taking any plural evidence, it would include both restricted and unrestricted stock, which would create an economic absurdity. I think, same too here, when you read this, when you look at the context of that provision with respect to the whole agreement and what the parties' goals were and what the customs and practices are in the industry, it is clear that to sell, assign, transfer, or otherwise dispose is looking at a situation where trialing would no longer have the contractual right to seek a milestone payment. You're confused, in my opinion, about the law on this rather basic contract provision in this circuit. We go down that road and this, that, this, that, and the other if this document is ambiguous. And would you concede that ambiguity is a question of law? We would, Your Honor. Okay. But we would point to the circuit's guidance in the Brass case which says whether an ambiguity exists in a contract. Ambiguous language is that which is capable more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of entire integrated agreement and who is cognizant of the customs, practices, and terminology as generally understood in the particular trade or business. And we would submit that here, Judge Rashan is certainly a reasonably intelligent person and had spent a whole trial, at the end, two trials, litigating claims under this merger agreement. And that when you look at 7.6c in the context of the entire integrated agreement and you look at what the customs, the practices, and the terminology, the restructurings, and this was a point in the trial, are very common in this industry. This was something that should be generally understood. And in that context, the agreement was ambiguous and it also would create an absurd economic result where a tri-agreement would have no recourse if there's a change in ownership but yet there's an internal restructuring which had no economic impact to them which would give them a $112 million windfall. I assume that I'm over my time. Well, I wanted to ask a raised judicata question. So Ms. Zaharia was arguing that Curtis, I think she believes, is sort of good for her. And I'm trying to explore that. I mean, Curtis makes a distinction between claims that arise after the filing of the original complaint and claims that arise prior to it. And so the claims here are claims that arise after or prior to the tri-agreement one. Go ahead. The claims would have arisen prior and that's because, Your Honor, the merger that was referenced and that's set forth in the Delaware filing where Iris was merged out of existence and the RWE entity assumed all of the rights and obligations. That was in December of 2020 and the operative pleading was in January of 2021. And Curtis really doesn't compel a different result here. The court and Curtis didn't reach the issue and it says nothing about what the consequences would have been. The court and Curtis held that the plaintiffs couldn't pursue their claims on the pre-complaint events because they waited more than a year after the deadline for amending the complaint. Correct. There were some that were before and some that were after. And the ones that were after, the court said, well, no, those are not barred by raised judicata because those the court refused to allow an amendment on because it wanted to keep the case manageable. And that's not on the merits and that's not relating to the raised judicata concern about due diligence. So I guess I'm going to ask Ms. Harian to address that as well, but I just want to make sure I'm not missing something. You're not missing anything, Your Honor, and we really think that EPCO really states this circuit's policy, which is it's regardless of the state court's reasons, I mean, that was the state court, but regardless of the court's reasons for denying leave to amend, it may fairly be said that plaintiff has failed to avail himself of an opportunity to pursue a remedy and thus application of raised judicata is warranted. And the same is true here. Trireme failed to avail itself of a remedy in Trireme 1 and therefore it is, you know, raised judicata is warranted on that basis. Well, I guess I would disagree with you to the extent if the reason for Judge Rashan or any judge to say you can't amend is because, no, we're too busy, we're ready to go, I don't want to do it. I don't think there would be a raised judicata problem then if you didn't appeal that with the original judgment. But that's not what happened here. Judge Rashan concluded that as in Curtis, the pre-complaint cause of action couldn't be added to this new operative complaint because the plaintiffs had dithered. Well, that's correct, Your Honor. I don't think there is a carve-out for, you know, if it's on the merits or not. I think it really is just it doesn't matter what the basis is for the denial. You need to seek leave to amend. But regardless, Judge Caproni, in denying leave to amend, relied extensively on the fact that the plaintiffs in that case had not shown diligence and there was a long hearing on this subject. But the point of the court was you can't keep different theories in your back pocket while you litigate a case for almost two years. And significantly, Trireme raised this new theory on the close of discovery. And there was evidence presented that it could have and should have been brought much earlier. And that was certainly central, I believe, to the court's reasoning that diligence had not been demonstrated. Again, Trireme failed to appeal that finding. If you thought that the contract permitted you to do what you did, why didn't you try to conceal the transaction from them? And, Your Honor, my client certainly never tried to conceal anything from Trireme. And in terms of discovery responses Are you sure about that? I am 100% positive. Okay. Are there any more questions? All right. No, if that's fine, we'll go back to Ms. Zaharia for two minutes of rebuttal. Let me start with Judge Sullivan's your question about Curtis. I urge the court to read not only Curtis but the case law cited in Curtis, the Northern Assurance case, which flat out rejects the interpretation of EPCO that RWE has argued Curtis and Northern Assurance hold that only denials of leave to amend on the merits give rise to res judicata and that makes sense But in Curtis we affirm the denial with respect to the the pre-complaint cause of death Correct. On normal res judicata principles what Curtis holds is that we apply normal res judicata principles Could the plaintiffs have asserted that claim in the prior litigation? Because they waited more than a year after the deadline for amending the complaint Because they had not exercised due diligence That is what this court held It did not simply say because denial of leave to amend was denied therefore res judicata It again analyzed as a matter of first principles whether res judicata attached because the plaintiffs could have brought their claim through the exercise of due diligence and what the court said in Curtis and what it said in Northern Assurance is when when leave to amend has been denied we still apply a normal res judicata principle Now the denial of leave to amend may the court said in Northern Assurance it may be a proxy for what we might conclude about due diligence but it is not itself relevant to the res judicata inquiry Putting that aside let me just tick off a few other points If the court looks at what we asked for we asked for quote a structure chart showing the resulting structure upon completion of the overall transaction that's at JA4064 they gave us what we asked for and the chart they gave us was incorrect and as to the one they can point to only one document produced in the many many thousands of documents produced in Discovery it's a draft it's at A7113 and all it shows is that RWE would continue to indirectly own these subsidiaries which is completely consistent with that chart that they gave us in response to our request So we urge the court to vacate and remand Thank you both Thank you all Thank you Thank you Thank you Thank you Thank you